# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO
_____

UNITED STATES OF AMERICA,

      Plaintiff,

      v.                                  Criminal No. 13-01152 WJ

GABRIEL MIRABAL,

      Defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTIONS FOR DISCLOSURE AND FOR SUPPRESSION[1]

THIS MATTER comes before the Court upon these motions following oral argument:

- Defendant's Motion for Disclosure and Production of Confidential Informants, filed April 4, 2014 (**Doc. 99**);

- Defendant's Motion to Suppress the Fruit of Title III Wiretap, filed April 4, 2014 (**Doc. 100); and**

- Defendant's Motion to Suppress, filed April 7, 2014 (**Doc. 102**).

Defendant and three other individuals have been charged with cocaine possession and distribution. Mirabal is the lead defendant in an alleged narcotics conspiracy which operated from March 2012 to April 2013 ("Mirabal Drug Trafficking Organization" or "Mirabal DTO"). The Government alleges that Defendant was involved in the trafficking of cocaine hydrochloride (powder cocaine) and cocaine base (cocaine base) and the cooking of the former into the latter for subsequent sale.

## I.  Defendant's Motion for Disclosure and Production of Confidential Informants (Doc. 99)

---

[1]  Although several pleadings were sealed in order to avoid unnecessary risk of the disclosure of certain identities, the Court will take precautions to avoid such disclosure and thus, finds no need to seal this Opinion.

Defendant seeks disclosure of information on two confidential sources ("CS-1" and "CS-2") used by law enforcement in the investigation of this case.     In this case, law enforcement arranged a controlled buy between co-defendant Michael Jaramillo and CS-1.   Once the transaction was complete, law enforcement immediately met with CS-1, who told law enforcement that Jaramillo informed him that Defendant Mirabal was Jaramillo's source of supply.   Defendant initially argued in his reply that CS-1 lied to law enforcement during the course of the investigation, specifically CS-1 either ingested or otherwise skimmed drug purchases for himself before delivering them to investigating agents.[2]     In the reply, however, Defendant's argument morphed into the contention that DEA Special Agent ("SA") Godier made material omissions on the affidavit concerning Defendant's criminal history.   There are two standards at play here.   The first standard, set forth in *Roviaro v. U.S.* 353 U.S. 53, 62 (1957), applies to the situation in which a defendant wishes to expose a confidential source that provides information to law enforcement outside of the warrant or wiretap context.   The second standard applies when a defendant seeks to reveal a confidential source's identity in order to challenge a search warrant or wiretap authorization, in which case a defendant must satisfy the requirements of *Franks v. Delaware*, 438 U.S. 154 (1978).

A.     Rovario Standard

*Rovario* does not apply here.   A defendant may be entitled to learn an informant's identity, but the right is not absolute, and the individual's right to prepare his defense must be balanced against the Government's interest in protecting its access to information and insuring an informant's safety.   *See Roviaro v. U.S.,* 353 at 62.   A defendant seeking to force the disclosure of a CS's identity bears the heavy burden of demonstrating that the CS's testimony will be helpful

---

[2]   Defendant also claims that CS-2 is unreliable as a source, but the parties' briefing and oral argument focused on CS-1, as CS-2 was never used in any of the controlled drug buys.

to, or is essential to a fair determination of, defendant's case. *See United States v. Gordon*, 173 F.3d 761, 767 (10th Cir. 1999).   The Court agrees with the Government that Defendant fails to allege that CS-1 has any information that would assist him in the preparation of his defense, since Defendant was not charged with any discrete buys between himself or CS-1. *Cmp. Mendoza-Salgado*, 964 F.2d 993, 1000 (10th Cir. 1992) (affirming denial of defendant's motion to disclose identity of DEA informant, where the informer did not actively participate in transaction but merely spread word about undercover agent's interest in large quantities of cocaine, and later informed the DEA that defendant could supply the drug).   At this time, Defendant cannot advise the Court whether he plans to call CS-1 as a trial witness.  This is very different from the situation in *Roviaro*, where the informant was the only individual who could rebut other testimony presented by government witnesses.  Here, Defendant merely asserts that the credibility of CS-1 is suspect, even though he doesn't necessarily plan to present them as witnesses.  This assertion is insufficient as a basis to require disclosure.  *See U.S. v. Ortiz*, 804 F.2d 1161, 1167 (10th Cir. 1986) ("defendant must do more than speculate about the usefulness of information about an informer"); *Mendoza-Salgado*, 964 F.2d at 1001) (mere speculation about usefulness of informant's testimony is not enough to warrant disclosure).   Thus, Defendant's motion fails under the *Rovario* standard.

B.     Franks Standard

The parties focused on the *Franks* standard at oral argument.   Under *Franks,* a defendant can challenge a facially sufficient affidavit supporting a search warrant on the basis that the police knowingly, intentionally, or recklessly included false information.   438 U.S. at 155–56. A defendant is not entitled to a *Franks* hearing unless he makes a "substantial showing that the affidavit contains intentional or reckless false statements and if the affidavit, purged of its

falsities, would not be sufficient to support a finding of probable cause." 438 U.S. at 155-56.[3] It is not enough for the defendant to show that the affiant knowingly falsified information or recklessly disregarded the truth, not simply that information was omitted from the affidavit or that the information wasn't completely true. *U.S. v. Owens*, 882 F.2d 1493, 1498-99 (10th Cir. 1989); *U.S. v. Green,* 175 F.3d 822, 828 (10th Cir. 1999) (noting that the *Franks* standard applies to affidavits in support of Title III intercepts). The test is whether the affidavit supports a finding of probable cause without the allegedly false information. *U.S. v. Morehead,* 959 F.2d 1489, 1498 (10th Cir.) *on reh'g sub nom. United States v. Hill*, 971 F.2d 1461 (10th Cir. 1992).

Defendant seeks to impeach CS-1's credibility regarding the statement that Defendant supplied Jaramillo with crack cocaine and thus undermine the probable cause requirement for the Court's issuance of an Order of Interception through electronic surveillance ("wiretap") which will be the subject of further discussion by the Court. However, in a *Franks* analysis, the only impeachment that matters is that relating to the affiant, which was SA Agent Godier, not CS-1. *See Franks*, 438 U.S. at 171 ("the deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant"). Thus, Defendant must show that SA Godier, not CS-1, knowingly falsified information or recklessly disregarded the truth, and not simply that information was omitted from the affidavit or that the information was not completely true. *See United States v. Owens*, 882 F.2d 1493, 1498-99 (10th Cir. 1989) ("it is not enough to show that . . . an affiant's negligence or innocent mistake resulted in false statements in the affidavit"). This means that Defendant must first show that the CS-1's

---

[3]   *See, e.g., United States v. Bloomgren,* 814 F.2d 580, 584 (10th Cir. 1987) (affirming district court's denial of defendant's motion to disclose confidential informants)(citations omitted); *United States v. D'Armond*, 65 F. Supp. 2d 1189, 1199-1200 (D. Kan. 1999) (the rule in the Tenth Circuit is that to obtain disclosure of a confidential informant referred to in a search warrant affidavit the defendant must make a substantial showing that the affiant knowingly made false statements, or made statements with reckless disregard for the truth).

information was false, and second, that Agent Godier knowingly, intentionally or recklessly included this information into the wiretap affidavit.

The Court recognizes two levels of arguments Defendant has raised within the *Franks* context: one is the effect of CS-1's credibility relating to probable cause for the Title III wiretap; and the other is SA Godier's truthfulness in the affidavit in the omission of some of CS-1's criminal history, which Defendant claims is relevant to CS-1 credibility, and thus probable cause for the wiretap. The criminal history at issue here consists of a 2004 arrest for concealing identity, which was a juvenile charge, a 2009 arrest for possessing marijuana and a 2009 complaint alleging identity theft and 20 counts of forgery. *See* Doc. 192-1 (ex parte) at 5. Defendant argues that mention of prior criminal history amounts to such a *Franks* violation.

The Court is not persuaded that SA Godier's omissions of CS-1's criminal history entitles Defendant to a *Franks* hearing. As the Government points out, there are several sources from which to obtain an individual's criminal history, none of which seamlessly match each other in providing this information. *See* Doc. 192-1. Defendant claims that the concealment of identity charges should have alerted law enforcement to do a more thorough check for other names CS-1 might have been using in order to broaden the criminal history search. The Court acknowledges that law enforcement might have conducted a more thorough inquiry into CS-1's criminal history under different aliases used, but does not find that any failure to do so on SA Godier's part suggests an intentional or reckless minimization of CS-1's criminal history. Moreover, Defendant has not made a showing that these omissions are material, which is required in order to be granted a *Franks* hearing. The Court's findings here are dispositive on both the effect of CS-1 credibility on probable cause for the Title III wiretap and as well as regarding SA Godier's representations in the affidavit. *See* Doc. 100-1 (Affidavit). Taking a "totality" approach to

those portions of CS-1's criminal history omitted from the affidavit, and any negative credibility consequences to CS-1's statements to law enforcement, the Court finds that these omissions do not doom the integrity of SA Godier's affidavit in support of the request for a wiretap.[4]   The Court agrees with the Government's assessment that if one excises from the affidavit all things related to CS-1's representations to law enforcement regarding Defendant's involvement in DTO, the affidavit is still supported by probable cause, as will be discussed in the next section. Accordingly, the Court denies this motion.

**II.     Defendant's Mirabal's Motion to Suppress the Fruit of Title III Wiretap (Doc. 100).**

Defendant moves to suppress the fruit of four wiretaps which Defendant contends were conducted in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §2510-22, and in violation of the Fourth Amendment.   18 U.S.C. §2518(1)(a) mandates suppression of the fruit of the wiretaps as a remedy for statutory violations of the Act.   Defendant contends that the wiretap at issue (the "initial" wiretap) was illegal because it lacked a probable cause basis and because the Government did not demonstrate the necessity for wiretaps of private telephone conversations when less invasive and more cost-effective investigate tools could have been used.

In March of 2012, the DEA began an investigation of Defendant Mirabal (also known as "Smiley"), Dominic Anaya, Michael Jaramillo, and other individuals suspected of being members of the DTO. From March to May of 2012, agents attempted to further their investigation through the use of various investigative methods, including but not limited to visual surveillance, use of at least one confidential informant and controlled purchases of crack cocaine, attempted trash collection and attempted introduction of an undercover agent.   On May 30,

---

[4]   *See Illinois v. Gates*, 462 U.S. 213, 233-34 (1983) (applying a "totality-of-the-circumstances" approach that traditionally has informed probable cause determinations).

2012, DEA Special Agent ("S/A") Christopher Scott Godier submitted an Affidavit to the Honorable James A. Parker, Senior United States District Judge, in support of an Application by the United States for an Order authorizing the interception of wire and electronic communications of Mirabal and other subjects yet unknown. The purpose of the application was to gather evidence with regard to these individuals' involvement in drug trafficking and money laundering offenses.

  A. <u>Legal Standard – Title III</u>

  A district court's wiretap authorization order is presumed proper, and the defendant bears the burden of overcoming this presumption.  *United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir. 1997). Thus, Defendant Mirabal must overcome the presumption that the order authorizing wiretap interception was proper.  Here, Defendant challenges the probable cause basis for the wiretaps and contends that the affidavits did not demonstrate the necessity for the highly invasive wiretaps when less invasive and more cost-effective investigative tools could have been pursued.

  Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522 (hereinafter "Title III") governs the requirements and procedures of judicially authorized wiretapping. *Berger v. New York*, 388 U.S. 41, 60 (1967) (judicially authorized wiretapping is "a most important technique" in the investigation of organized crime).   The Title III statute requires that an application for an order authorizing the interception of wire communications "shall be made in writing upon oath or affirmation to a judge[.]" 18 U.S.C. § 2518(1). Such an application must include "a full and complete statement of the facts and circumstances relied upon by the applicant . . . to justify his belief that an order should be issued[.]" 18 U.S.C. § 2518(1)(b).  These applications draw their factual basis from an affidavit offered by an agent or

officer familiar with the facts and circumstances of the investigation. The authorizing judge will then enter an ex parte order allowing interception of telephonic communications over the subject phone if he concludes from the facts and circumstances set forth in the wiretap application that there is probable cause and necessity as formulated in the statute:

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in . . . [18 U.S.C. § 2516];

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; [and]

(d) . . . there is probable cause for belief that the facilities from which, or the place where, the . . . communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3).

Defendant contends that the Government violated both Title III and the Fourth Amendment. Title III is designed to mirror the Fourth Amendment's right of people "to be secure in their persons, houses, papers, and effects," and to "remain free from unreasonable searches and seizures," including while using a telephone. *Katz v. United States*, 389 U.S. 347, 359 (1967). However, similar to situations where there is an alleged violation of the Fourth Amendment, not every violation of Title III necessarily leads to suppression. *See United States v. Killingsworth*, 117 F.3d 1159, 1165 n.4 (10th Cir. 1997) (holding that "failure to name all persons subject to a wiretap [as required by 18 U.S.C. § 2518(1)(b)(iv)] does not render the wiretap unconstitutional" or require suppression of evidentiary fruit). Rather, suppression is only necessary for violations of those provisions of Title III that have "a central . . . role in guarding

against unwarranted use of wiretapping[.]"   *United States v. Donovan*, 429 U.S. 413, 437 (1977).

Each extension of a wiretap must meet the requirements for the initial wiretap.  *See* 18 U.S.C. §2518(5).  "Extensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3) of this section." 18 U.S.C. § 2518(5).  An extension may not be any longer than necessary. "The period of extension shall be no longer than the authorizing judge deems necessary to achieve the purposes for which granted and in no event longer than thirty days." 18 U.S.C. § 2518(5).    This means that each application must stand on its own and bootstrapping the necessity requirement from previous investigations into subsequent applications (meaning the extension application in this case) is not allowed.   Section 2518(1)(f) specifically requires an extension affidavit to provide "a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results." 18 U.S.C. § 2518(1)(f).

B.    <u>Legal Standard- Entitlement to *Franks* Hearing</u>

As discussed above, a defendant may challenge a search conducted pursuant to a warrant on the grounds that the warrant affidavit, even though facially adequate to support probable cause, contained actual misstatements or omissions that may have influenced the issuing magistrate.   *See Franks,* 438 U.S. at 155-56 (defendant can challenge a facially sufficient affidavit supporting a search warrant on the basis that the police knowingly, intentionally, or recklessly included false information); *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997) (If the reviewing court determines than an affiant has knowingly or recklessly included false information that is material to the determination of probable cause, evidence seized

pursuant to that warrant must be suppressed).   A criminal defendant may challenge a facially valid search warrant on the grounds that the police knowingly, intentionally, or recklessly included false information.  438 U.S. at 155-56.   *Franks* has been subsequently extended to include material omissions as well.   *United States v. Kennedy*, 131 F.3d 1371, 1375 (10th Cir. 1997). Should a defendant satisfy his burden under *Franks*, suppression is the appropriate remedy.   *United States v. Leon*, 468 U.S. 897, 923 (1984).   However, misstatements or omissions caused by "negligence or innocent mistake[s]" do not warrant suppression.  *Franks*, 438 U.S. at 171.

*Franks*, however, does not bestow a defendant with an automatic right to an evidentiary hearing even if a defendant makes a substantial preliminary showing that the affiant, either knowingly or recklessly, made false statements in his affidavit.   *United States v. Barrera*, 843 F.2d 1576, 1580 (10th Cir. 1988); *United States v. Small*, 423 F.3d 1164, 1172 (10th Cir. 2005) (citing *Franks*, 438 U.S. at 156); *United States v. Hall*, 473 U.S. F.3d 1295, 1301 (10th Cir. 2007) (a defendant may challenge a facially sufficient affidavit "on the ground that the police included deliberate or reckless falsehoods that were material to the district court's finding that the wiretaps were necessary").   This challenged information must be material as well, that is, it must be determinative of probable cause.  As the Supreme Court has held, "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding a probable cause, no hearing is required." *Franks*, 438 U.S. at 171-72.  In the Title III context, the materiality standard applies also to the facts set forth in support of the necessity of the wiretap authorization.   *U.S. v. Green,* 175 F.3d 822, 828 (10th Cir. 1999); *see also U.S. v. Rajaratnam,* 719 F.3d 139, 146 (2d Cir. 2013).  If the

untainted portions of the application "are sufficient to support the probable cause or necessity findings, then the misstatements are not 'material' and suppression is not required." *Id.* at 146.

C.   <u>Probable Cause For Initial Application</u>

Defendant claims that the four affidavits supporting the application for the wiretaps and one extension did not contain probable cause to believe that Defendant was engaged in criminal activity. Specifically, Defendant contends that law enforcement failed to use certain traditional investigative tools, and failed to use other methods efficiently or completely. Four wiretaps were authorized by a district judge. See Doc. 157 at 3-4. However, the only affidavit challenged by Defendant is the one from May 30, 2012 signed by SA Godier. Ex. A. Interception was authorized over Defendant's cellular phone from May 30, 2012 to June 28, 2012, and the authorization was renewed from July 9 to August 8, 2012. The latter extension application was dated July 9, 2012. Ex. B.

A court's determination of probable cause for a wiretap interception is reviewed under the same standard as a search warrant. *United States v. Amendariz*, 922 F.2d 602, 608 (10th Cir. 1990). Probable cause is determined by looking at the "totality of the circumstances." *United States v. Benard,* 680 F.3d 1206, 1210 (10th Cir. 2012). The statement of facts and circumstances in a wiretap application and affidavit must establish "probable cause to believe a particular offense has been, is being, or is about to be committed, and that conversations related to the offense will be overheard" on the subject telephone if authority to intercept is granted. *United States v. Armendariz*, 922 F.2d 602, 607 (10th Cir. 1990). "Probable cause" has the same meaning in a wiretap application as it does in a search warrant application or in any other context. *Id.* at 608. The authority to intercept wire communications is reserved for cases involving certain crimes, including offenses involving "narcotic . . . or other dangerous drugs,"

18 U.S.C. § 2516(1)(e), and money laundering, 18 U.S.C. § 2516(1)(c).  Probable cause for a wiretap may be established through factual information about previously monitored conversations over the subject telephone, telephone data linking the subject telephone to drug trafficking activity, statements from confidential sources, physical surveillance and/or other evidence.  *United States v. Apodaca*, 820 F.2d 348, 350 n.2 (10th Cir. 1987) (finding probable cause for wiretap based on observations of subject at location of attempted undercover cocaine purchase and pen register information connecting subject to the phone "the government wished to tap").

In reviewing the district court's authorization of a wiretap interception, an appellate court gives "great deference to the issuing judge's finding of probable cause," and "ask[s] only whether, under the totality of the circumstances presented in the affidavit, the . . . judge had a 'substantial basis' for determining that probable cause existed."  *United States v. Haymond*, 672 F.3d 948, 958-59 (10th Cir. 2012) (quoting *United States v. Tuter*, 240 F.3d 1292, 1295 (10th Cir. 2001)).  Where a judge has authorized electronic surveillance, "the fact that the issuing judge found probable cause is itself a substantial factor tending to uphold the validity of the order so issued."  The authority to intercept wire communications is reserved for cases involving certain crimes, including offenses involving "narcotic . . . or other dangerous drugs," 18 U.S.C. § 2516(1)(e), and money laundering, 18 U.S.C. § 2516(1)(c).  Probable cause for a wiretap may be established through factual information about previously monitored conversations over the subject telephone, telephone data linking the subject telephone to drug trafficking activity, statements from confidential sources, physical surveillance and/or other evidence.  *United States v. Apodaca*, 820 F.2d 348, 350 n.2 (10th Cir. 1987) (finding probable cause for wiretap based on

12

observations of subject at location of attempted undercover cocaine purchase and pen register information connecting subject to the phone "the government wished to tap").

For background, the Court sums up the relevant facts and circumstances contained in the thirty-nine page affidavit at issue (Ex. A):

- *Controlled buys:* CS-1 arranging a meet with Jaramillo on the first controlled buy, which occurred on March 21, 2012 (the first controlled buy); the meet was observed by visual surveillance.  Agents observed a gray Chevrolet pickup registered to Dominic Anaya at Jaramillo's residence, and occupied at the time by a single Hispanic male driver. Jaramillo exited his residence and got into the passenger seat of the truck, which the agents followed to a pre-determined location to meet with CS-1.  Jaramillo gave 2 ounces of cocaine base to CS-1 and told CS-1 that the driver of the gray pickup truck was "Smiley" (Mirabal), and that Smiley was the source of supply for the cocaine base and had transported the cocaine base to Santa Fe from Albuquerque.  Agents observed Mirabal accompanied by Jaramillo drive from the meet location back to Jaramillo's residence, saw Jaramillo get out of the truck into his residence.  The pickup truck, with Mirabal driving, was stopped for a turn signal violation.  Agents maintained surveillance until Mirabal arrived at a residence which agents believe is Mirabal's current address.

- The affidavit describes the second controlled buy which occurred on April 19, 2012 involving CS-1 visiting Jaramillo at his residence.  CS-1 turned over 50.3 gross grams of suspected cocaine base after meeting with Jaramillo, and stated that Jaramillo told him he would be receiving cocaine base from his source of supply later that same day and would contact CS-1 to sell him the additional cocaine base.

- Intercepted cellular calls (Jan. 11, 14, & 17, 2012) involving Mirabal:

  o several calls between Raul Simental and Mirabal, with Mirabal asking Simental if he had communicated with his "homie" friend about obtaining "stucco."  Based on his training and experience, SA Godier believed that "stucco" referred to cocaine.  Simental was later indicted for conspiracy to distribute meth and confirmed that Mirabal is involved in the distribution.  He also confirmed that "stucco" was a reference by Mirabal to cocaine.  He told agents that he was acting as a middlemen between his source of supply and the buyer "Gabe" whom he knew was involved with cocaine trafficking.   Simental identified Mirabal as "Gabe" from a driver's license photo of Mirabal.   Doc. 100-1 at 12-13 and Doc. 100-2 at 1.

  o Calls intercepted between Vincent Jaramillo (Michael's brother) whom CS-1 advised also obtains cocaine base from Mirabal, as a result of toll records, pen register and trap and trace information for voice communications; calls between CS-1 and Michael Jaramillo ("M. Jaramillo") regarding the March 12, 2012 meet; text communications from toll records and pen registers for electronic (SMS text)

communications between Mirabal and the Jaramillo brothers, and also a Sergio Duran, who was suspected of being Mirabal's "source of supply," based on the frequency of cell calls between Mirabal and Duran.  Doc. 100-2 at 2-3 and 7-8.

o   calls between Michael Jaramillo and CS-1 on April 19, 2012 regarding the controlled buy that day, with CS-1 agreeing to buy drugs from Jaramillo and the latter advising CS-1 that he would get more cocaine base from his source that same day.

o    the basis for use of confidential sources, including past assistance provided by CS-1.  Doc. 100-1 at 8-9.

The affidavit also goes into detail describing the various investigative techniques used to gather information prior to applying for the wiretap, which the Court will discuss later in the context of "necessity."

Despite all of the above information contained in the affidavit linking Mirabal with a controlled drug transaction and numerous contacts with known drug dealers, Defendant implausibly contends that his presence at one illegal drug sale is not enough to provide a basis for probable cause.[5]   Mirabal's presence at the March 21, 2012 controlled buy was clearly not the sole basis for finding that probable cause existed for the issuance of the wiretap—although that alone would have sufficed.  *See United States v. Brooks*, 438 F.3d 1231, 1241 (10th Cir.2006) (an officer has probable cause to arrest if, "under the totality of the circumstances, he learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested"); *United States v. Armendariz*, 922 F.2d at 607 (probable cause is established when there is belief that a particular offense has been, is being, or is about to be committed, and that

---

[5]   As the Government notes, defense counsel's statement that Mirabal was "not in the immediate area of the purchase" (*see* Doc. 100 at 16) is not supported at all, since the only evidence is the observation based on visual surveillance that he was driving the car with Jaramillo as his passenger on March 21, 2012.  It is true, however, that Mirabal was not present for the April 19, 2012 buy.

conversations related to the offense will be overheard" on the subject telephone if authority to intercept is granted").

It is difficult to understand what more defense counsel would require before probable cause is satisfied. In addition to Mirabel's presence at the March 21, 2012 controlled drug buy, the information in the affidavit supports a belief that Mirabal was involved in something more than simply using drugs, as defense counsel intends. The affidavit gave information on numerous phone calls between Mirabal and known drug dealers, Raul Simental and M. Jaramillo, in January 2012. Doc. 100-1 at 12-13. Defense counsel argued that these calls should not be viewed discretely, but rather viewed in the context of other calls made to other people who were not known drug dealers. However, it is impossible to ignore the fact that law enforcement picked up, as a result of prior authorized wiretaps, a grand total of 225 calls between M. Jaramillo and Defendant Mirabal in a little more than a two month period, from March 1 and May 12, 2012—which is difficult to accept as a normal frequency of calls, even between two very good friends who are not known drug dealers. *See* Doc. 100-2 at 3. In addition Raul Simental informed law enforcement about Mirabal's role in the drug supply chain The Court finds this ample to support a belief that Mirabal was using his phone and his car to facilitate drug deals, not only on March 21, 2012, but on other days as well.

It is true that Mirabal was not present for the April 19, 2012 controlled buy of crack cocaine. According to the affidavit, Jaramillo advised CS-1 he did not have three and half ounces of cocaine base that CS-1 requested, and that he would contact his source of supply for the remainder for CS-1's purchase later in the evening. Call records show at least 20 calls between CS-1 and M. Jaramillo (between 11:03 a.m. and 9:10 p.m. on that date), and as many texts between them from 11:11 a.m. and 10:36 p.m. Doc. 100-2 at 4-5. CS-1 advised agents

that at 6:21 p.m., Jaramillo texted CS-1 that Jaramillo's source of supply was on his way with the additional cocaine base, and by 8:30, Jaramillo texted CS-1 that he had the additional crack cocaine.   It is also true that the calls between CS-1 and Jaramillo do not definitely involve Mirabal.  However, several voice calls between Jaramillo and Mirabal occurred that day between 10:55 p.m. and 11:17 p.m.  Law enforcement conducted simultaneous surveillance of Jaramillo and CS-1 in Albuquerque and Mirabal in Santa Fe, but called off the surveillance after ten hours before it could be confirmed that Mirabal was Jaramillo's source of supply.   Nonetheless, SA Godier believed that the toll analysis indicated the timing of the calls between Jaramillo and Mirabal appeared to correspond to the collection of proceeds for crack cocaine delivered earlier in the evening on a prearranged basis.   Doc. 100-2 at 5. [6]

As the Government put it, the April 19th drug deal was not the "showstopper."  Probable cause for a wiretap can be established through evidence of previous conversations over a target telephone about drug-related matters.  *See, U.S. v. Errera,* 616 F.Supp. 1145, 1150 (D. Md. 1985) (finding probable cause for wiretap based on application referencing 6 phone calls made by a CI to subject where drug purchases were discussed).   The information provided by SA Godier about controlled purchases of drugs, recorded phone conversations, analysis of telephone toll records and other investigative efforts was sufficient to warrant a person of reasonable caution to believe that the offenses of drug trafficking and conspiracy were being committed by Defendant Mirabal, Jaramillo, and others, and that communications about these activities would be overheard on the intercepted calls during the requested period of interception.   The Court finds that all of these facts when reviewed in sum and in totality, and which were presented to

---

[6] Defendant argues that he had no contact with Jaramillo on April 12th, and that the additional supply of cocaine was obtained two hours before Jaramillo had any contact with Mirabal.  However, it would be just as plausible to conclude that Mirabal was not contacted by Jaramillo until the deal was sealed and the proceeds were collected.

the judge issuing the wiretap order, provide a substantial basis for the conclusion that probable cause existed.

Also, in the previous discussion on Defendant's motion for disclosure of confidential informants, the Court found that probable cause did not rise and fall on information supplied by CS-1, and thus issues with his credibility were not material to a finding of probable cause.   It should be clear from the Court's findings on probable cause for the wiretap, that probable cause existed apart from any statements made by CS-1 about Mirabal's involvement.

D.    Extensions

Each extension for a wiretap must meet the requirements for the initial wiretap.  *See* 18 U.S.C. § 2518(5); *see United States v. Giordano*, 416 U.S. 505, 530 (1974) (application for an extension also must satisfy the same requirements as an original order); *United States v. Kessack*, 983 F.2d 1078 (9th Cir. 1993).  Section 2518(5) of Title 18 requires that each application for an extension of a wiretap must include a full statement of facts regarding necessity, as is required for original applications, under section 2518(1)(c). There is, however, an additional statutory requirement in Title III for extension applications.  Section 2518(1)(f) specifically requires an extension affidavit to provide "a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results." 18 U.S.C. § 2518(1)(f).

Also, extensions of prior wiretap authorizations cannot be given without consideration of the results meanwhile obtained; otherwise, communications intercepted under the extension order are derivative evidence and must be suppressed.  *Giordano*, 416 U.S. at 515.  Thus, each extension application or supporting affidavit must not only explain why the wiretap application

17

was necessary in the first place, but also why the earlier wiretaps have not yet yielded the expected results.  *See U.S. v. Brone*, 792 F.2d 1504, 1506 (9th Cir. 1986).

Defendant contends that all subsequent wiretaps should be suppressed because the initial wiretap lacked probable cause and necessity.   He offers no argument as to why the Court should suppress the extension in the event the Court finds that the initial wiretap met the probable cause and necessity requirements.   Since the Court has found that probable cause existed for the issuance of the wiretap, Defendant's arguments relating to the extension must fail.

E.    Necessity for Initial Application

Defendant contends that law enforcement failed to fully utilize the standard investigative techniques before applying for the wiretaps, and that law enforcement did not use the information gathered in conjunction with other investigative techniques.   Defendant also asserts that other normal investigative techniques must be tried before resorting to the extraordinary step of a wiretap.

The necessity requirement ensures that "wiretapping is [only] resorted to in situations where traditional investigative techniques would [not] suffice to expose the crime" under investigation. *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974); *U.S. v. Foy,* 641 F.3d 455, 464 (10th Cir. 2011).   However, law enforcement officials "are not required to exhaust all other conceivable investigative procedures before resorting to wiretapping." *United States v. Edwards*, 69 F.3d 419, 429 (10th Cir. 1995); *see also United States v. Dennis*, 786 F.2d 1029, 1035 (11th Cir. 1986) (holding that purpose of necessity requirement "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques").   What Title III requires is that an application for wiretap shall

18

include, in part:   a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.   18 U.S.C. §2518(1)(c).   An application containing only "boilerplate" allegations could be grounds for rejection.   *United States v. Castillo-Garcia*, 117 F.3d 1179, 1188 (10th Cir. 1997)(overruled on other grounds by *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 n.1 (10th Cir. 2002));   *see U.S. v. Blackmon,* 274 F.3d 1204, 1210 (9th Cir. 2001) (boilerplate assertions unsupported by specific facts relevant to the particular circumstances of this case not sufficient as basis for Title III wiretap application). Providing only "[g]eneralities, or statements in the conclusory language of the statute, [is] insufficient to support a wiretap application.   The statements must be factual in nature and they must specifically relate to the individuals targeted by the wiretap."   *Id*.   However, this does not mean that the use of some "boilerplate" or conclusory language in a wiretap application will preclude a finding of necessity.   *United States v. Torres*, 908 F.2d 1417, 1423 (9th Cir. 1990) (presence of conclusory language in affidavit does not negate finding of necessity if affidavit as a whole alleges sufficient facts demonstrating necessity); *United States v. Carneiro*, 861 F.2d 1171, 1177 (9th Cir. 1988) (concluding that necessity requirement met for wiretap based on affidavit as a whole, even though some statements were mere conclusions).

Courts expect law enforcement to address four broad categories of investigative techniques, or else explain "with particularity" why each of them "would be either unsuccessful or too dangerous."   *Castillo-Garcia*, 117 F.3d at 1187.   These categories are: "(1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants."   *U.S.*

*v. Van Meter,* 278 F.3d 1156, 1163-64 (10th Cir. 2002).   Aside from these four categories, there is no "general rule," as to which other preliminary investigative techniques must be attempted "because they are so dependent upon the nature of the investigation and the crimes being investigated." *Castillo-Garcia,* 117 F.3d at 1188.

The question of necessity must be considered in relation to the objectives of the specific investigation.   *Killingsworth*, 117 F.3d at 1165 (explaining that necessity requirement satisfied because "none of [the normal] investigatory techniques [mentioned in the application] provided the government with sufficient information to complete its investigation" of a large scale drug distribution ring); *United States v. Blackmon*, 273 F.3d 1204, 1210 (9th Cir. 2001) (noting how "investigative backdrop" set forth in wiretap application "set[] the stage for discussing what traditional methods of investigation . . . failed or [would] fail or would be too dangerous").   In addition, an investigative agency's "failure . . . to explain its failure to utilize one or more specified categories of normal investigative techniques will not be fatal to its wiretap application if it is clear, under the government's recitation of the facts of the case, that requiring the government to attempt the unexhausted and unexplained normal investigative techniques would be unreasonable."   *Id*. at 1188.   When a wiretap application demonstrates necessity for the interception of communications over a particular telephone, "the Government [is not required to] investigate all persons who may be using . . . [that] telephone in order to determine their possible complicity."   *U.S. v. Kahn,* 415 U.S. 143, 153 n.12 (1974).

A.      Initial Application

Defendant claims that the Government's assertion that none of the traditional investigative techniques would be effective is flawed because, even though any one of them would not be effective singularly, in conjunction these tools would have been effective and

obviated the need for a wiretap.    Drawbacks to any of these other traditional methods of investigations "are all generic problems of police investigation." *Blackmon,* 274 F.3d at 1211. Therefore, Defendant contends, the Government cannot use this as an excuse to circumvent the need for law enforcement to try these other methods or to use them without maximizing the information that could be gleaned from their usage:

- use of other potential sources other than the CS's.
- physical surveillance
- pole cameras
- search warrants
- financial investigation
- pen registers and toll records
- grand jury/administrative subpoenas/interviews of subjects
- cell site and E-911 precision location information

*Using other potential sources other than the CS's:*

Defendant contends that law enforcement could have and should have recruited other individuals to work as confidential sources or informants ("CS's"), such as the Jaramillo brothers, Raul Simental, and Michael Nieto in order to obtain more information related to the stated purposes of the request for the wiretap, or used to set up a buy with Mirabal.  SA Godier's affidavit includes an explanation as to why law enforcement utilized CS-1 to assist in the investigation, including the fact that CS-1 had provided previous assistance in other investigations which yielded information resulting in "seizures of cocaine, seizures of US Currency and arrests of numerous defendants."  Doc. 100-1 at 8.  The affidavit also states that CS-1 was "believed to be extremely reliable and the information provided is believed to be true and accurate." *Id*

As the Government notes, Defendant does not specify exactly how many other "potential sources" should have been used.  At oral argument, the Government explained that the selection of individuals to assist in the investigation was a matter of "risk versus reward." The

Government also provided acceptable reasons as to why these other individuals were not used. For example, use of the Jaramillo brothers posed a risk in that had either of them refused to cooperate, the entire investigation might have been destroyed because their confederates would have been alerted.   Raul Simental had already been arrested and indicted, and releasing him at that point to act as an informant would have looked suspicious.   Contrary to Defendant's belief, DEA agents *did* attempt to gain information from him about his trafficking activities but his cooperation was not fruitful.  Another interesting suggestion by defense counsel was the use of Sandra Jaramillo, but the Court finds it easy to understand why law enforcement chose not to enlist her in the investigation of her son and his best friend, the Defendant.

***Physical surveillance***:

Defendant criticizes the scope and length of physical surveillance that occurred, noting that it consisted of a total of only 10 hours, with about 8 of those hours coming from surveillance that occurred on three days, March 26, March 27, and April 19, 2012.

Defendant also specifically targets the efficacy of the surveillance that occurred on April 19, 2012, the second controlled buy.   On that day, agents conducted "simultaneous surveillances" of Jaramillo and CS-1 in Albuquerque, and of Mirabal in Santa Fe.  Defendant notes that there is a time discrepancy in the end-times of the surveillance.   SA Godier states in his affidavit that the surveillance of Mirabal in Albuquerque "ended later in the evening" on April 19, 2012.   Doc. 100-2 at 10.   Another report, submitted by an Officer Duron, stated that surveillance ended at 3:24 p.m.  Ex. D.   However, the report regarding Mirabal's surveillance, submitted by SA Garver, indicates that surveillance ended at 1:00 p.m.   Law enforcement never observed Mirabal meeting with Jaramillo.  The Government blames the time discrepancy in the surveillance reports on the fact that neither agent has any control or supervision over what the

other writes.  The Government also suggests that SA Garver's statement that surveillance ended at 1 p.m. does not specify whether the termination referred to the entire surveillance team, or just to SA Garver's participation.

While the Court finds that law enforcement could have been more thorough in the surveillance, and perhaps attempting to take it to completion (that is, determining whether Jaramillo met with Mirabal as his source of supply later than day), this finding is easy to make with the benefit of 20/20 hindsight.  By that time, as the Government notes, surveillance had continued for ten hours before it was terminated, and there was always the risk of targets becoming suspicious and delaying planned meets, which caused delay and setbacks for law enforcement conducting the surveillance.  On the other hand, the Court disagrees with defense counsel's characterization of law enforcement "dropping the ball" on surveillance as an investigative tool.   Law enforcement is not required to "exhaust every conceivable investigative technique in order to show necessity."   *United States v. Torres*, 908 F.2d 1417, 1423 (9th Cir. 1990).   There was no indication at the time how long it would be before a meet between Mirabal and Jaramillo or whether it would be delayed.  The agents' failure to see the surveillance through to a planned meet between these two does not constitute a lack of necessity for the wiretap.

***Pole cameras*:**

Defendant contends that SA Godier intentionally misled the Court when he stated in his affidavit that there were no pole cameras on which a pole camera should be mounted.    In the May 30, 2012 affidavit in support of application for interception of electronic communications (Ex. A), SA Godier stated that a pole camera would not be feasible because no telephone poles existed in the area around Mirabal's residence.  Street light poles were available, but installation of a pole camera on a street light pole was "not possible' with the available equipment" and

would be "clearly identifiable."   Ex. A., Doc. 100-3 at 3, ¶ 49.  Defendant claims this was a lie, because in the July 9, 2012 affidavit, SA Godier states that a camera had in fact installed near Mirabal's residence on June 5, 2012—which is only five days after SA Godier's representation that such equipment was not available.  Ex. B, ¶ 29.

According to SA Godier's explanation to Government counsel, after the initial wiretap he consulted with a technical agent at DEA and was able to get this second variety of camera which could be installed on street light poles—which is exactly what was done on June 5, 2012.   This is consistent with SA Godier's statements in the affidavit.   However, the installation of the pole camera did not obviate the need for the wiretap.  As the Government noted, pole cameras only show when people come and go, and electronic surveillance is needed to make sense out of that information.

***Search warrants:***

Defendant contends that the Government should have used search warrants as a way of gathering evidence related to the Mirabal DTO, and that since Mirabal was on probation at the time, law enforcement could have conducted a search in the guise of a warrantless spot search by a probation/parole officer.  There are several reasons why Defendant's challenge to the necessity of the wiretap fails on this issue, all of which were set forth in the affidavit.  First, the Government contends that execution of a search warrant early in the case would have revealed the DEA's investigation against the Mirabal DTO.  Doc. 100 (Ex. A), ¶ 51.  Second, a search by agents of the DEA (an executive agency) conducted under the pretext of a search by New Mexico Probation (an arm of the court system) could potentially create issues in the area of separation of powers.  As the Court noted at the hearing, defense counsel would undoubtedly have had something to say about the legal basis for such a search.  An independent warrant

would have been needed for the search, in which case Mirabal likely would have been alerted to an ongoing investigation. Third, DEA agents did in fact execute search warrants, which resulted in crack cocaine being seized from the residences of both Defendant and Jaramillo.  As a result of a search pursuant to a warrant, agents also recovered from Mirabal's residence a firearm, ammunition and body armor.   Fourth, it was unlikely that a search of Defendant's residence would show the total scope of the conspiracy, as it is unlikely that all principals or drugs would be available at that one location.

***Financial investigation***:

Next, Defendant claims that law enforcement should have undertaken a financial investigation early in the case.  Uncovering the financial underpinnings of the alleged enterprise could have satisfied objectives indicated in the wiretap affidavit.   Instead, law enforcement conducted a financial investigation after they already obtained authorization for the initial wiretap.  Defense counsel is grasping at straws here, claiming only that agents might have gleaned some information had they tried this method.   However, there is no indication at all that a financial investigation would have revealed much at all about Mirabal's trafficking activities, and the Court rejects the notion that failure to conduct a financial investigation  shows a lack of necessity for the wiretap.

***Pen registers and toll records:***

Defendant contends that law enforcement failed to "optimize" the use of pen registers, trap and trace devices and toll records.   There is no merit to this contention at all.   The Government notes that these techniques were, in fact, used to determine which numbers Defendant called and when, as well as the frequency and method (phone or text) of these communications.   Doc. 100-2 at 2-3, ¶ 24.   Defendant claims that the Government uses the

"excuse" that this method is not sufficient, but the Court agrees with the Government in that these methods obviously cannot provide information as to the *content* of the calls monitored through pen registers and toll records.  Without the content of these conversations, there would be a critical evidentiary gap in the information.  *See United States v. Killingsworth*, 117 F.3d 1159, 1164 (10th Cir. 1997) (finding necessity where application explained that "use of pen registers and long distance toll records . . . were incapable of determining which individuals actually made and received the . . . calls" and could not "ascertain the nature of the calls"); *Van Meter*, 278 F.3d at 1164 (finding necessity where application explained that "pen registers and toll records . . . establish[ed] the number and duration of calls [but] could not uncover the content of the conversation at issue in the extortion investigation").

**Grand jury/administrative subpoenas/interviews of subjects:**

Defendant claims that even though use of grand jury or administrative subpoenas would not have provided law enforcement with all of the information required to make a case against Mirabal, the method should have been utilized.   However, in his affidavit, SA Godier explains reasons why this method would have been ineffective, and even detrimental to the investigation: individuals involved in the conspiracy would likely have asserted their Fifth Amendment not to testify; they likely would have alerted others to the investigation; and use of this process might have even foreclosed prosecution of possibly some of the most culpable members of the conspiracy, not to mention the possibility that these immunized witnesses may not provide truthful testimony. Ex. A, ¶ 55, ¶ 56.

**Cell site and precision location information & GPS tracking**

Cell site information is used to track an individual's location.   Defendant contends that law enforcement should have used this tool, but does not explain how this tool would have been

effective in the investigation.   Law enforcement did not use cell site information in this investigation because neither cell site nor precision location information can pinpoint exactly where an individual is located, or relay what the party is doing at the time.   As the affidavit states, agents would know that a specific cell tower was being used, "but not the location of the user of the cell phone, or the location where the suspected criminal activity is taking place." Doc. 100-3, ¶ 59.   Thus, Defendant's assertion that these techniques would reveal Mirabal's source of supply is unfounded.

Defendant has the same argument with regard to GPS tracking devices, but the affidavit explains why these devices were not used in the investigation.   Mirabal drives at least three different vehicles which are registered to third parties; if the tracking devices were discovered— and they often are—the investigation would be compromised.   Also, discovery of the tracking devices was a potential risk, since Mirabal's vehicles have high, exposed undercarriages that would easily reveal a tracking device.   Ex. A, ¶ 60.   Defendant scoffs at these reasons, claiming that law enforcement could have put tracking devices on *all* the vehicles driven by Mirabal.   He also discounts incidents where tracking devices were discovered by noting that there are also incidents where the devices were used successfully, baldly asserting that GPS devices are discovered when law enforcement "clumsily" places the GPS device on a vehicle.   Doc. 100 at 34.

There are many flaws to thess arguments, to name a few: first, GPS tracking *was* used by the agents.   Second, in his initial affidavit and affidavit to renew the interception, SA Godier stated that the location information gleaned was not accurate enough to determine Defendant's location when he moved from his home to other locations.   The affidavit set out other risks

27

associated with using GPS trackers in this investigation such as the discovery of installed trackers and how this compromised entire investigation. Doc. 100-3, ¶ 60; 100-6, ¶ 43. [7]

F.     Showing of Necessity for Extensions

As discussed in the previous discussion, each extension for a wiretap must meet the requirements for the initial wiretap. *See* 18 U.S.C. § 2518(5); *see United States v. Giordano*, 416 U.S. 505, 530 (1974) (application for an extension also must satisfy the same requirements as an original order).    The Court's finding that SA Godier's May 30, 2012 affidavit contains a sufficient showing of necessity for the issuance of the wiretap Order precludes Defendant's argument that the extension application was deficient, and Defendant's motion is denied on this issue as well.

G.     Court's Conclusions: Motion to Suppress Fruit of Title III Wiretap (Doc. 100)

*No Title III Violation*

Based on the foregoing discussion, Defendant has failed to show that Title III was violated because the affidavits were supported by probable cause.  The information provided by SA Godier about controlled purchases of drugs, recorded phone conversations, analysis of telephone toll records and other investigative efforts, was sufficient to warrant a person of reasonable caution to believe that the offenses of drug trafficking and conspiracy were being committed by Defendant, Jaramillo, and others; and that communications about these activities would be overheard on the Target Telephone during the requested period of interception.     The affidavits also satisfied the requirement of a showing of necessity.  A supporting affidavit for an application for electronic surveillance must show, in part, that normal investigative procedures

---

[7]  At the hearing, Defendant presented several pictures of the vehicles used by Mirabal in an effort to debunk  the Government's argument about the visibility of the tracking devices.   *See* Exs. G-L (hearing exhibits).  However, those pictures did not convince the Court that the devices would be unlikely to be discovered.

have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.  SA Godier's affidavits (both the initial and the extension) contained information showing a necessity for the wiretap, despite the fact that certain techniques (such as the pole camera and continued physical surveillance) were not carried out to defense counsel's preferences.

One of Defendant's recurring themes is that agents failed to use the traditional investigative techniques in conjunction with each other.  It is abundantly clear to the Court that this contention is not supported by the evidence.  However, the Court finds that DEA agents *did* in fact utilize various traditional investigative methods and that information was collected from all of these methods.  SA Godier's affidavit specifically set forth the set forth the drawbacks for each of them, and explained why electronic surveillance was necessary.  The Court rejects Defendant's contention that law enforcement was required to use every traditional method in the investigation.  Although generally a wire intercept should not constitute the first step in an investigation, the Government "need not exhaust every conceivable investigative technique in order to show necessity.  *See U.S. v. Bennett,*  219 F.3d 1117, 1122 (9th Cir. 2000) (stating that wiretap statute "does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and principal in question to a point where the investigation becomes redundant or impractical or the subjects may be alerted and the entire investigation aborted by unreasonable insistence upon forlorn hope").   Defendant imposes a burden on law enforcement that the law does not require.  *United States v. Verdin-Garcia*, 516 F.3d 884, 890 (10th Cir. 2008) (internal quotation omitted) ("[t]he overall burden on the government [to demonstrate necessity] is not great").

*No Entitlement to Franks Hearing*

29

The Court also finds that Defendant is not entitled to a *Franks* hearing.   Defendant has not made the requisite preliminary showing of an affirmative misrepresentation or omission of a material fact, either as to the lack of probable cause or necessity.   For example, Defendant argues that SA Godier's representations about the availability of pole cameras were suspect because the appropriate equipment suddenly became available soon after the affidavit was signed; and that physical surveillance was faulty and did not show necessity because it did not continue longer.   There is no suggestion that the affidavit statements on these investigative methods were misrepresentations of any sort: there is no indication that SA Godier was trying to hide the end time of the surveillance, or that he was being less than truthful about the availability of the appropriate pole camera equipment at the time he submitted the affidavit.   Further, as the Government notes, each of these discrepancies occupies such an infinitesimally small role in the overall scope of this investigation, Doc. 157 at 40, and it cannot be said that either probable cause or necessity turned upon either the ability to install pole cameras on street light poles, or on whether the simultaneous surveillance of Mirabal in Santa Fe and Michael Jaramillo in Albuquerque ended at a particular time.    Even if these inaccuracies were intentionally made (a proposition that is submitted purely for argument's sake), they would make no difference in the validity of the application for the wiretap.   *See Franks v. Delaware,* 438 U.S. at 171-72 (when affidavit contains materially false information which was submitted intentionally or with reckless disregard for the truth by law enforcement officer, court should redact false information and review affidavit de novo to determine whether remaining allegations establish probable cause); *U.S. v. Morehead,* 959 F.2d 1489, 1498 (10th Cir.), *on reh'g sub nom, U.S. v. Hill,* 971 F.2d 1461 (10th Cir. 1992).   On these findings, therefore, Defendant's Motion to Suppress the Fruits of the Title III Wiretap is DENIED.

**III.    Defendant's Motion to Suppress, filed April 7, 2014 (Doc. 102)**

In this motion, Defendant moves to suppress all statements and all physical evidence (namely, an assault rifle and drugs) that were recovered following a stop and search of Defendant's vehicle, contending that his Fourth Amendment rights were violated.[8]

A.    Facts

Pursuant to the wiretap signed in May 30, 2012 by the judge, agents began intercepting Defendant's cell phone calls.   Two days prior to the stop and search in question, agents had intercepted calls by Defendant to a Joseph Herrera, in which Defendant told Herrera he was "white-eyed" (interpreted by agents to being related to cocaine).    Defendant repeatedly referenced "white" in his conversations with Herrera, and inquired when "it" was expected to be ready.   Herrera stated that "it" (referencing the "white") was expected to be ready "today" (meaning February 14, 2013).   Defendant told Herrera that he had "flipped that thing for 35" and that he had enough to "fund a 100 round drum."    Defendant also added that he would call "homeboy" about the "SK," which agents believed referred to a firearm, specifically a SKS assault rifle.   From these intercepted conversations, agents believed that Defendant and Herrera were going to meet at Defendant's home to exchange cocaine and an assault rifle.[9]

On February 14, 2013, Deputy Micah Barker was dispatched to an area near Unser Road in Albuquerque, NM to make contact with DEA agents in assisting with a vehicle stop and search of a suspected drug dealer's vehicle.    Deputy Barker was told that the vehicle to be

---

[8]  Defendant does not specifically describe *what* statements he seeks to suppress.  His arguments focus only on the search of the vehicle which recovered physical evidence.

[9]   At the hearing, defense counsel offered other plausible interpretations for phrases caught on the recorded calls, such as "white-eyed" meaning *not* being high.  However, the agents' interpretation of the same phrases are just as plausible if not more so, considering that these interpretations are based on the agents' knowledge and experience dealing with these matters.  Further, probable cause "is a matter of probabilities and common sense conclusions, not certainties."  *U.S. v. Biglow,* 562 F.3d 1272, 1280 (10th Cir. 2009).  Thus, a possible alternative meaning to "white-eyed" in no way dissipates the probable cause basis for the agents' belief that a drug crime was about to be committed.

stopped was under surveillance at a particular address and was suspected of containing assault weapons, and that any search he performed would be covered by DEA probable cause.    That same day, February 14, 2013, agents established visual surveillance of Defendant at his residence.   Herrera arrived at Defendant's residence driving a black Dodge Charger before Defendant had arrived home.   Defendant arrived a few minutes later in a black Jeep, and agents observed him removing what appeared to be a gray soft gun case from the back seat and place it in the trunk of a red Infiniti that was parked at his residence.   Herrera also gave Defendant another package which Defendant placed in the backseat area of the Infiniti.   The two then entered the residence, and exited a half hour later.   Herrera departed in his charger, and Defendant entered the Infiniti and sped off southbound, quickly evading surveillance for about 20 minutes.   When agents again were able to locate Defendant, he was still in the Infiniti and traveling at a high rate of speed.

Defendant was stopped by Deputy Barker when he drove his red Infinity away from his home.  Deputy Barker told Mirabal that he was stopped for speeding, and discovered through a vehicle information check through NCIC that Mirabal wasn't the registered owner.   Deputy Barker then told Mirabal he would be conducting a search of the car, despite Mirabal's refusal to consent to the search.   After Mirabal exited the car, a knife was found on the passenger seat but no other weapons were found from a pat-down search, or a search of the car or trunk.   A search of the trunk revealed a subwoofer box ("speaker box") covered in gray carpet.  Deputy Barker then went back to the rear passenger compartment and folded down the rear arm rest and found another compartment, and found a 12 x 6 x 3" package, which turned out to be 1126.4 gross grams of cocaine.

B.    Discussion

Defendant contends that there was no reasonable suspicion for the stop, and even if there was, the fruits of the car search need to be suppressed because there was no probable cause to support the subsequent search of the vehicle.

The Government contested Defendant's standing to challenge the stop. *See United States v. Deninno*, 29 F.3d 572, 576 (10th Cir. 1994) (a person desiring to have evidence suppressed "must first show he has standing to object to the search). Defendant contended that he has standing to contest the car search because co-defendant Dominic Anaya, the car's owner, had given him permission to use the car while he was incarcerated. At the hearing, defense counsel presented a taped voice recording which was stipulated to be Mirabal's voice telling the listener that Anaya had given him permission to use his vehicles. The Court found this sufficient to establish standing, and proceeded to the merits of the motion.

The Fourth Amendment requires that police have an articulable and reasonable suspicion of criminal conduct before making an investigative stop of an automobile. *United States v. Rodriguez-Pando*, 841 F.2d 1014, 1016-17 (10th Cir. 1988), citing *United States v. Sharpe*, 470 U.S. 675, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985). A traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation. *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995). Under the automobile exception to the warrant requirement, police officers may stop and search a car if they have probable cause to believe it contains contraband, regardless of whether a traffic violation has occurred or a search warrant has been obtained." *United States v. Bernard*, 680 F.3d 1206, 1210 (10th Cir. 2012) (citing *United States v. Chavez*, 534 F.3d 1338, 1343–45 (10th Cir. 2008); *U.S. v. Ludwig,* 10 F.3d 1523, 1528 (10th Cir. 1993) (warrantless search of automobile is reasonable if there is probable cause to believe it contains contraband).

Defendant argues that the premise for the speeding ticket is not clear and that even if there was reasonable suspicion for the stop and search of the vehicle, Deputy Barker went beyond a permissible search because both the subwoofer box and rear arm rest compartment were not big enough to hide an assault rifle.   Defendant argues that if law enforcement was entitled to search for something as small as ammunition on the pretext of searching for an assault rifle, every search as the potential to be overly broad.   He also points out that while possession of a gun and ammunition is a crime for a convicted felon, Deputy Barker would not have been aware of Defendant's status as such.

Defendant's argument would make some sense if the search was premised on a traffic violation.  However, Deputy Barker is entitled to rely on the collective knowledge of the DEA agents who had intercepted Defendant's calls a few days prior to the traffic stop.  Based on visual surveillance, DEA agents observed Defendant transfer what appeared to be a soft grey gun case and a package of drugs to the red Infiniti; they had evidence from other intercepted calls around June 2012 between Defendant, Anaya and another co-defendant (Sam Eylicio, Jr.) indicating a discussion of cooking cocaine into cocaine base as well as negotiations for several one ounce quantities of cocaine and crack cocaine.[10]  Agents recognized the language used in the calls to be references to orders for amounts of drugs and amounts of money owed.   Visual surveillance was also set up around that time, in which agents observed Anaya and Defendant carrying a white bag, walk into Jaramillo's home.

---

[10]   The Government had anticipated that Defendant would argue that the latter recorded conversations and surveillance were too remote in time to be relevant or admissible.   Defendant did not make these arguments, but the Court agrees with the Government's position that remoteness is not a factor here, since law enforcement was investigating an ongoing conspiracy.  *See United States v. Myers*, 106 F.3d 936 (10th Cir. 1997) (rejecting staleness challenge to search warrant based five-month old wiretap information because drug activities were "ongoing and continuous").

While Deputy Barker personally may not have been aware of Defendant's status as a convicted felon, the DEA agents did, and their knowledge may be imputed to Deputy Barker under the collective knowledge doctrine.   *See, e.g., U.S. v. Chavez,* 534 F.3d 1338 (10th Cir. 2008) (stop and search of defendant's vehicle was justified where, based on DEA investigation, DEA task force officer directed patrolman to stop and search vehicle); *U.S. v. Cervine,* 347 F.3d 865, 872 (10th Cir. 2003) (state troopers had reasonable suspicion based both on the representations by DEA agent that defendant was likely transporting illegal narcotics and on the facts supporting this assertion); *see also U.S. v. Whitley,* 680 F.3d 1227 (10th Cir. 2012) (knowledge of agent who had personal knowledge of defendant's criminal possession of a firearm, violating §922(g), was sufficient to establish probable cause for local officer).   Thus, on this basis alone, Deputy Barker had reasonable suspicion to search Defendant's car, and on this basis, a legal search was not limited only to places that would hide an assault rifle.

Deputy Barker testified at the hearing that he had met with DEA agents the day before the stop.   He stated that he could not remember the particulars of the speeding violation, but recalled that he had calibrated his radar gun the day before the stop.   Defendant offered no evidence that would suggest that Deputy Barker stopped Mirabal on pretext and found Deputy Barker to be credible about the basis for the stop.   Deputy Barker described the search.   After seeing a knife in plain view on the car seat, he proceeded to search the trunk, where he saw a speaker box almost as big as the length of the trunk.   It was about six inches deep, large enough to hold an assault rifle, and appeared to have been installed aftermarket.   Deputy Barker knew from experience that back seats can be modified to hide items.   He attempted to look behind the speaker box, but it would not budge.   Not being able to move the box, Deputy Barker went back to the car and moved the back seat to determine if there was a gap between the speaker box and

35

the back seat.  He pulled down the armrest compartment and saw a silver foil-covered package wrapped in clear film in the area behind the compartment.   Deputy Barker testified that the object of the search at that time continued to be an assault weapon, which could have been hidden in the area between the speaker box and the back seat, and that searching behind the armrest was the only practical way to search behind the box.  *See U.S. v. Ross,* 456 U.S. 798, 825 (1982) ("scope of warrantless search is defined by the object of the search and the places in which there is probable cause to believe that it may be found").

The Court found Deputy Barker's testimony to be credible, including his testimony that he searched behind the back seat in the armrest area in order to gain access to the trunk in looking for an assault rifle.  In addition, the Court finds that in this situation, the search was not limited to finding an assault rifle, based on the agents' knowledge that Defendant was a convicted felon who was prohibited from carrying a weapon or ammunition, and on their reasonable belief that Defendant was arranging a meet to exchange cocaine and an assault rifle.

For the above reasons, the Court finds that the stop of Defendant's car on February 14, 2013 was supported by reasonable suspicion and that the search was supported by probable cause.

**THEREFORE,**

**IT IS ORDERED** that:

(1)   Defendant's Motion for Disclosure and Production of Confidential Informants **(Doc. 99)** is hereby DENIED, with regard to both the effect of CS-1's credibility relating to probable cause for the Title III wiretap; and SA Godier's truthfulness in the affidavit in the omission of some of CS-1's criminal history, under either the *Rovario* or *Franks* standard, as described above in this Memorandum Opinion and Order;

(2)     Defendant's Motion to Suppress the Fruit of Title III Wiretap **(Doc. 100)** is hereby DENIED, based on the Court's finding that SA Godier's affidavit is supported by probable cause and a showing of necessity, and that there is no preliminary showing that SA Godier made any intentional or reckless material representations or omissions; as described in this Memorandum Opinion and Order; and

(3) Defendant's Motion to Suppress **(Doc. 102)** is hereby DENIED, based on the Court's finding that there was probable cause for the stop and search of Defendant's vehicle was legally valid for reasons described in this Memorandum opinion and Order.

_____
UNITED STATES DISTRICT JUDGE